900 So.2d 628 (2005)
D.S., Mother of D.B., and T.A., Children, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, et al., Appellees.
No. 5D04-739.
District Court of Appeal of Florida, Fifth District.
March 18, 2005.
*629 Lauren Zimmerman, Maitland, and J. Manuel Acevedo, Sanford, for Appellant.
Mark A. Skipper, of Dept. of Children and Families, Sanford, for Appellee.
Ryan Thomas Truskoski of Ryan Thomas Truskoski, P.A., Orlando, for Appellee FatherR.A.
SHARP, W., J.
D.S. (the mother)[1] appeals from an order which closed a dependency case of two of her three children, T.A. and D.B., and which granted permanent custody of T.A. and D.B. to their respective fathers R.A. (R.A., the father of T.A.) and T.B. (T.B, the father of D.B.). She argues that the trial court erred in closing the case as to these children and thus denying her reunification with them. We agree and reverse.
On April 19, 2003, at about 6:00 p.m., the mother left T.A., eight years old, and her young child N.B.,[2] asleep in her car while she took D.B. inside a Super Wal-Mart to go shopping. The car windows were left open. She was gone ten to fifteen minutes. When she came outside, she was given a citation by the Sanford Police Department. The mother said she thought it was okay to leave the children in the car because of T.A.'s age and because the children were asleep at the time.
The next day, A CPI investigator came to the mother's home and interviewed her. The investigator reported that the apartment in which the family lived was dirty, disorganized, cluttered, had food on the floor and that the kitchen was filthy with old food and dirty dishes. Dirty clothes were piled in the bedrooms and the children had no clean clothes. There was little food in the refrigerator, but there were dry and canned goods in the pantry.
The mother agreed to take part in Voluntary Protective Services and agreed to participate in the Home Makers Program and Healthy Families Program. However, the mother missed some appointments. On May 14, 2003, the mother was arrested by the Sanford Police Department for harboring, concealing or aiding an escaped prisoner. The charge was later reduced to accessory after the fact, which the state had moved to dismiss. The prisoner was D.B. ("D.B.," the father of N.B.) who had escaped from the Okeechobee Redirection Center. After the mother was arrested, T.A. and D.B were taken into protective custody.
A petition for dependency was filed as to the mother, and a case plan was prepared. The goals of the case plan were reunification of the children with the mother, reunification between D.B. and N.B., and to "maintain and strengthen" T.A.'s ties with R.A, and D.B.'s ties with T.B. The case *630 plan also recited that the children were strongly bonded with the mother. The mother consented to the dependency.
The case plan required the mother to complete a parenting class; to obtain and maintain stable housing; and upon reunification, to successfully complete a permanency planning program. The mother began the latter program on November 11, 2003 and it was to continue for six months. After ninety days, the children could go back into their mother's home and be reunified with her (i.e., on February 3, 2004).
R.A. and T.A. were found to be nonoffending parents, meaning they had done nothing to contribute to the children's dependency. T.A. was placed with R.A, in Jacksonville; D.B. was placed with T.B, in Deltona, and the youngest, N.B. was placed with her paternal grandmother in Sanford.
The predisposition study indicated that T.A. and D.B. both said the mother does not usually leave them unsupervised in the car. Neither were bruised or marked and both said their mother disciplined them by sending them to their bedrooms. D.B. said he went into Wal-Mart with his mother, and his sister and brother were left in the car because they were sleeping. All the children were in good physical health.
On November 19, 2003, a judicial review hearing was held before a general master. The general master found that the mother had substantially complied with the case plan and that all of the tasks had been completed save for the permanency plan, which was ongoing.
At the request of the Department and guardian ad litem (GAL), the general master ordered that the case plan be amended to require the mother to complete a psychological evaluation. The attorneys for the fathers wanted the general master to close the case as to T.A. and D.B., but he at first refused to do so because he said he needed the psychological examination to fully make a decision. He also said that if the mother did not need treatment and there was nothing wrong in the psychological evaluation, he might be reluctant to close the case as to T.A. and D.B.[3]
However, attorneys for R.A. and T.B. continued to argue that because the children were with their natural non-offending parents, they were no longer dependent.[4] The general master questioned whether it was acceptable to close the case as to T.A. and D.B. before the comprehensive assessments[5] were back. Ultimately, the general master was persuaded and decided to close the case as to these children. The mother underwent a psychological evaluation, which was favorable to her and which recommended that the children be reunited with her. This report was filed with the court prior to the January 20, 2004 *631 hearing on the mother's fourth motion for reunification. At that hearing, the court summarily denied the mother's motion, accepted the general master's recommendations, and ordered a change of custody from temporary to permanent in favor of R.A. and T.B.
On appeal, the Department claims that the children have been in the custody of their fathers for six months and have not been harmed.[6] It argues that there was a dual goal in the case plan: strengthening the ties of the children with R.A. and T.B. or reunification with the mother. A goal of strengthening ties of children with their father instead of reunifying them with their mother is permissible. F.M. v. Dept. of Children & Families, 807 So.2d 200 (Fla. 4th DCA 2002)(mother's case plan not required to have goal of reuniting her with daughter). We reject that argument in this case, because the goal was reunification of the children with the mother, reunification of N.B. with D.B. (the father of N.B.), and for T.A. and D.B. to "maintain and strengthen" [ties] with R.A. and T.B. The goals of reunification with the mother and maintaining and strengthening ties with R.A. and T.B. are not mutually exclusive.
We observe that both fathers had failed to pay child support until 2002, and R.A. was subject to garnishment. He was unemployed and he relied on $465 disability income, which was insufficient to meet the family's needs. R.A. had a long criminal history, including carrying a concealed weapon, cocaine possession, drug possession, criminal mischief (property damage) and probation violation. He had visited T.A. only a couple of times in the past and had ignored him and the mother since before birth. After he received temporary custody of T.A., he moved and could not be located by the Department, or his own attorney. He was ordered to appear in court, but failed to do so. And his disappearance had interfered with visitation between the mother and T.A.
T.B, who lived near the mother, was living with his "paramour," a caregiver for D.B., and both had been arrested for domestic violence burglary with a battery against T.B's ex-wife, although the charges were dismissed. T.B.'s mother resides with him also, and she has a criminal history as well. D.B. described an incident to his grandmother and a child care worker in which he said T.B had beaten him. Bruises and marks were evident on D.B.'s body. T.B said that he had sustained these bruises and marks as a result of his playing football, and the incident was deemed unfounded.
Thus, there is nothing to indicate the fathers would create more suitable home environments than the mother, who had never been involved with the police prior to her leaving T.A. and N.B. alone in her car for 10-15 minutes. She had raised these children from birth, without any financial or other help from the fathers, who neglected and at least in R.A.'s case, abandoned them.
We find error in this case that the case plan for T.A. and D.B. was closed prior to the expiration of the 12 month period during which the mother had to *632 comply with the terms of the case plan. See section 39.601(7). We note that in this case, the plan did not expire until May of 2004, and that the mother was eligible, under the permanency plan she was undertaking, to have reunification with the children on February 3, 2004, before expiration of the twelve months in May of 2004.
We also find error that the general master closed the case as to T.A. and D.B. without giving the mother any time to comply with the amendment that she undergo a psychological evaluation. We agree with the general master that there was substantial competent evidence to require the mother to undergo a psychological evaluation,[7] based on her relationship with D.B, N.B.'s father. However, amendment of a case plan must be by the court,[8] and the mother was entitled to an opportunity to complete that requirement under the due process clause.[9]
Further, in closing the case as to T.A. and D.B. and giving permanent custody to the fathers, the general master's ruling was contrary to his own pronouncement that the mother had substantially complied[10] with the case plan, as well as being contrary to the evidence presented.[11] There was nothing adduced at the hearing to show that T.A. and D.B.'s safety, well-being, and physical, mental, and emotional health would be endangered by their reunification with the mother. See also Fla. R. Juv. P. 8.415(f)(2)(court must find that parents have substantially complied with the case plan, and the court "shall" return the child to the custody of the parents if the court is satisfied reunification will not be detrimental to the child).
While a trial court is bound by a general master's factual findings, the findings must be supported by competent, substantial evidence. Edwards v. Edwards, 730 So.2d 711 (Fla. 4th DCA 1999). Our review of the record does not disclose that there is competent substantial evidence to support a finding that the children's best interests would be served by permanent placement with R.A. and T.B.
We therefore vacate the permanent custody placement with R.A. and T.B. and remand to the trial court for an evidentiary hearing geared towards reunification with the mother,[12] unless the court determines, based on new evidence, that reunification with the mother would pose a threat to the children's physical, mental, and emotional health. The trial court should consider the mother's psychological evaluation, and the comprehensive assessments *633 as to the fathers. It may also consider any other pertinent evidence which has occurred since the last hearing.
REVERSED AND REMANDED.
SAWAYA, CJ. and PLEUS, J., concur.
NOTES
[1] D.S. is the 31 year old mother of T.A., age 8; D.B. age 6, and N.B. less than 2 years old at the time this action arose. She is a registered nurse and works at nursing homes 32 hours per week and has a flexible work schedule. She has cared for these children since birth.
[2] N.B. was born in 2002.
[3] The 12 month period had not expired at that time. § 39.601(7).
[4] We note that this argument has not been authorized by the Legislature. It is particularly abhorrent in a situation like this one, where both children had been abandoned and neglected by their fathers until the inception of this case. Moreover, it nullifies those statutes in Chapter 39 which otherwise provide for reunification with the mother.
[5] Section 39.01(17) defines comprehensive assessment:

"Comprehensive assessment" or "assessment" means the gathering of information for the evaluation of a child's and caregiver's physical, psychiatric, psychological or mental health, educational, vocational, and social condition and family environment as they relate to the child's and caregiver's need for rehabilitative and treatment services, including substance abuse treatment services, mental health services, developmental services, literacy services, medical services, family services, and other specialized services, as appropriate.
[6] See Fla. R. Juv. Proc. 8.345, Post-Disposition Relief. Subsection (b) provides:

Motion for Termination of Supervision or Jurisdiction. Any party requesting termination of agency supervision . . . shall do so by written motion or in a written report to the court. The court shall hear all parties present and enter an order terminating supervision. . . . The court shall not terminate jurisdiction unless the child is returned to the parent and has been in the placement for at least 6 months, the child is adopted, or the child attains the age of 18. (emphasis added)
[7] See § 39.601(9)(f).
[8] See § 39.601(9)(f).
[9] See 5th Amend. U.S. Const.; Art. I, section 9, Fla. Const.
[10] Substantial compliance is defined in section 39.01(68) as:

[t]he circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well being and safety of the child will not be endangered upon the child's remaining with or being returned to the child's parent.
[11] Section 39.522(2) provides:

(2) In cases where the issue before the court is whether a child should be reunited with a parent, the court shall determine whether the parent has substantially complied with the terms of the case plan to the extent that the safety, well-being, and physical, mental, and emotional health of the child is not endangered by the return of the child to the home. (emphasis added)
[12] Where a mother has substantially complied with her case plan, the children must be reunited with her if it is safe for the children to do so. See section 39.522(2); In re H.H., 865 So.2d 634 (Fla. 2d DCA 2004); In re M.C., 796 So.2d 566 (Fla. 2d DCA 2001).